[Cite as *Whitson v. Dixie Imports, Inc.*, 2020-Ohio-1549.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| DELLA WHITSON, et al., | : | |
| Appellees, | : | CASE NO. CA2019-09-157 |
| | : | O P I N I O N |
| - vs - | | 4/20/2020 |
| | : | |
| DIXIE IMPORTS, INC., | : | |
| Appellant. | : | |

CIVIL APPEAL FROM FAIRFIELD MUNICIPAL COURT
Case No. 2018SCI089

Della Whitson, Deshanna Whitson, 11527 Framingham Drive, Cincinnati, Ohio 45240, pro se

Richard L. Hurchanik, 110 North Third Street, Hamilton, Ohio 45011, for appellant

**RINGLAND, J.**

{¶1}   Defendant, Dixie Imports, Inc. ("Dixie"), appeals from the decision of the Fairfield Municipal Court, Small Claims Division, which granted a $6,000 judgment to plaintiffs, Della and Deshanna Whitson.  For the reasons described below, this court affirms the small claims court's decision.

{¶2}   In December 2018, Della and her daughter Deshanna, filed a complaint

against Dixie for the jurisdictional maximum damage amount of $6,000. The Whitsons' complaint stemmed from their purchase of a used vehicle from Dixie, a car dealership in Fairfield, Ohio. The complaint alleged that the vehicle's motor had seized and that a vehicle diagnostic examination revealed that it had never been serviced.

{¶3} The matter proceeded to a two-day hearing before a magistrate. Della testified that she and Deshanna visited Dixie's lot in May 2018 with the intent of purchasing a vehicle for Deshanna. They were at the lot for several hours and test drove several vehicles. Ultimately, they did not find a vehicle they were interested in purchasing. As they were leaving, Earl Burns, the dealership manager, approached them and asked if they would be interested in looking at a vehicle that the Whitsons said was not "marked" for sale.

{¶4} The vehicle was a 2011 Chevrolet Malibu with over 114,000 miles.[1] The Whitsons test drove the vehicle and ultimately agreed to purchase it for $15,741.20 plus the costs of financing. The price included $1,686 for a "service contract." In addition, Dixie provided the Whitsons with a "We Owe" document, listing some minor repairs that Dixie agreed to make to the Malibu within 30 days. The repairs included fixing a door panel, a trunk release mechanism, and a vent cover.

{¶5} The Whitsons introduced a copy of a "retail purchase agreement" which listed the vehicle and the total agreed sale price. In inconspicuous font, a section of the purchase agreement contained preprinted language stating that the vehicle was being sold "as-is" and disclaimed any warranties in conjunction with the sale. The purchase agreement also contained a list of other items included in the sale and their cost. Among these items was the aforementioned "service contract." The purchase agreement reflected that the Whitsons made a down payment of $5,000.

---

1. Della Whitson claimed that the vehicle registered 118,000 miles when they purchased it. The purchase paperwork indicates the vehicle was sold with 114,148 miles.

{¶6}    Approximately one week after the purchase, the Malibu would not start.  Della contacted a Dixie salesperson and reported the issue and asked for the vehicle to be towed to Dixie.  Della also informed the salesperson that no one from Dixie had contacted them about repairing the "We Owe" items.  In response, the salesperson asked if the Whitsons had purchased a warranty with the vehicle.  Later, the salesperson stated that Dixie was only obligated to fix items on the "We Owe" list.

{¶7}    Approximately one week later, Della's husband swapped a battery into the Malibu and was able to start the engine.  He and Della then drove the vehicle to Dixie's lot.  A confrontation ensued at the lot, which Della video recorded.   During the argument, Earl Burns took Della's husband aside and told him that he had fired Dixie's service manager.  Della further claimed that Burns admitted that the vehicle had never been serviced and he apologized.  He promised to make the matter right and fix the vehicle.

{¶8}    The Whitsons left the Malibu at the Dixie lot, where it remained for a week.  When the Whitsons retrieved the vehicle, Dixie had replaced the battery and fixed some of the items on the "We Owe" list.

{¶9}    Deshanna thereafter drove the Malibu for approximately three months.  The Whitsons stated that they changed the oil in July.  The vehicle drove without issue until late September, when it stopped operating at 122,240 miles.  The vehicle dashboard displayed a check engine light.  The Whitsons contacted Dixie, who told them they needed to contact "Superior Insurance," the warranty company ("Superior").

{¶10}    The Whitsons contacted Superior and were told that they would need to obtain a vehicle diagnostic.  The Whitsons had the vehicle towed to a Firestone service center.  Firestone refused to perform the diagnostic and told the Whitsons to remove the vehicle from their lot.  The Whitsons then towed the vehicle to Jake Sweeney Chevrolet.

{¶11}    Sweeney technicians performed a compression test, which revealed no

engine compression. After removing the camshaft cover, technicians found that the engine had been severely neglected and that the oil was "harder than sludge." Sweeney mechanics recommended engine replacement, replacement of the battery, which was in a "weak" condition, and replacement tires. The total cost for repairs was in excess of $13,000, with most of the cost allocated to the engine replacement.

{¶12} A Sweeney employee informed a Superior adjuster that Sweeney could prove that the engine had not been serviced in over 20,000 miles. A Superior employee then contacted Deshanna and informed her that Dixie had never serviced the vehicle and therefore they would not honor the warranty.

{¶13} Earl Burns testified for Dixie. He stated that the vehicle was sold "as-is" and he had replaced the battery as a courtesy. The only other repairs Dixie promised were on the "We Owe" document. On cross-examination, when asked whether the vehicle had been serviced, Burns responded, "[w]e would service the vehicle, as far as oil changes and stuff like that."

{¶14} The Whitsons played the confrontation video for the court. Afterwards, Burns admitted that he had told the Whitsons that he fired his service manager but added that he would have told them "anything that they wanted to hear" to diffuse the situation. Nonetheless, Burns confirmed that he had fired a service manager two days before the confrontation.

{¶15} The magistrate later issued a written decision finding for the Whitsons. The court found that the Whitsons were hesitant to purchase the vehicle but that Burns promised them repairs and offered a service contract on the vehicle that would remedy any engine issues without additional cost. The court found that the Whitsons had never received any paperwork on the service contract/warranty or a list of any exclusions or conditions and that no exceptions were ever explained to them by Dixie. The court noted that the purchase

agreement indicated an "as-is" transaction but that this language was negated by Dixie including a service contract in the sale.

{¶16} The magistrate concluded that Dixie breached the purchase agreement by including a service contract for which the Whitsons paid $1,686 but received no benefit. The court further found that Dixie violated the Ohio Consumers Sales Practices Act in two ways: by representing that the vehicle was in a good condition despite having no knowledge of the condition of the vehicle or its history, and for charging the Whitsons for a service contract that the Whitsons did not receive from either Dixie or Superior. [2]

{¶17} The magistrate recommended a $6,000 judgment in favor of the Whitsons. The magistrate noted that the Whitsons had expended incidental costs related to towing and diagnosing problems with the Malibu, that they had endured several months of inconveniences, and that the repairs would cost more than the value of the vehicle. Dixie objected, which objections were overruled by the court, which then adopted the magistrate's decision in full.

{¶18} Dixie appeals, raising five assignments of error. Each assignment of error contains multiple issues for review. Some of the assignments of error and some of the issues presented are duplicative. For judicial economy, this court will address some assignments of error collectively.

{¶19} Assignment of Error No. 1:

{¶20} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT/APPELLANT IN OVERRULING ITS OBJECTION TO THE MAGISTRATE'S DECISION AND ADOPTING SAID DECISION.

{¶21} Assignment of Error No. 3:

---

2. Dixie does not assign error to the court's conclusion that it violated the Ohio Consumers Sales Practices Act.

{¶22}  THE COURT AND THE MAGISTRATE ERRED WHEN THE MAGISTRATE WROTE PLAINTIFF NEVER RECEIVED AN EXPLANATION OF THE INCLUSIONS, EXCLUSIONS, OR CONDITIONS OF THE WARRANTY OR WHAT WAS LABELED AS A SERVICE CONTRACT IN EXHIBIT B.

{¶23}  Assignment of Error No. 4:

{¶24}  THE COURT ERRED WHEN IT FOUND THAT THE SALE OF A SERVICE CONTRACT MADE THE TRANSACTION NOT AN "AS-IS" TRANSACTION.

{¶25}  This court reviews Dixie's arguments challenging the trial court's factual findings for some competent, credible evidence to support those findings. *Morgan v. Ramby*, 12th Dist. Warren Nos. CA2010-10-095 and CA2010-10-101, 2012-Ohio-763, ¶ 21. If there is competent, credible evidence to support the factual findings, this court reviews whether, after weighing the evidence and resolving evidentiary conflicts and issues of credibility, the trial court properly applied the governing law to those factual findings. *Id.* This court reviews legal issues de novo. *Ohio Dist. Council of the Assemblies of God v. Speelman*, 12th Dist. Butler Nos. CA2018-02-025 and CA2018-02-031, 2018-Ohio-4388, ¶ 18.

{¶26}  In its first, third, and fourth assignments of error, Dixie presents various arguments challenging the trial court's factual findings and legal conclusions with respect to its finding that Dixie breached the parties' vehicle purchase agreement.

<u>The finding that the purchase was not "as-is" and</u>

<u>whether the Whitsons received the warranty documents</u>

{¶27}  Dixie argues that the trial court's conclusion that the vehicle purchase transaction was not "as-is" was not supported by the evidence.  Dixie contends that the existence of the warranty/service contract did not alter the "as-is" nature of the transaction. Finally, Dixie argues that there was no evidence to support the court's finding that Dixie

assured the Whitsons that the warranty would cover any repairs.

{¶28} Where a written contract is standardized and between parties of unequal bargaining power, an ambiguity in the writing will be interpreted strictly against the drafter and in favor of the nondrafting party. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 13, citing *Cent. Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413 (1980). And it is "generally the role of the finder of fact to resolve ambiguity." *Id*. Under the circumstances presented in this case, whether the transaction was "as-is" was a factual determination for the small claims court. And competent and credible evidence supports the conclusion that the transaction was not "as-is."

{¶29} The purchase agreement, which is clearly a form prepared by Dixie, contained preprinted language in inconspicuous font indicating that the purchase of the vehicle was "as-is." However, the same document listed a "service contract" with a cost of $1,686. No other details concerning the service contract were described on the document.

{¶30} The evidence established that the Whitsons were ready to leave Dixie's lot but that Burns induced them to purchase the Malibu with the promise to make repairs and sell them a warranty. The court credited the Whitsons' claim that Dixie did not provide them with documentation concerning the service contract or otherwise explain any limitations to the service contract. Deshanna testified that she had to request information from Dixie on how to have the vehicle repaired under the service contract because she had no paperwork related to Superior. Deshanna further testified that it was Dixie that provided her with the policy number.

{¶31} Dixie also argues that the Whitsons introduced four out of five pages of a copy of the warranty/service contract at the hearing, implying that their possession of a copy of part of the contract would cast doubt on their claim that they did not receive the warranty document at the time of the sale. However, it is just as conceivable that the Whitsons'

obtained a copy of the contract at some later point, e.g., after Dixie provided Deshanna with Superior's contact information and the Whitsons' policy number. Consequently, this court finds no error in the trial court's conclusion that the agreement between parties was not "as-is" and that the Whitsons never received any documentation or information concerning limitations on the warranty.

Oil changes

{¶32} In a series of supplemental issues, Dixie raises various arguments concerning the evidence related to oil changes. Dixie's essential argument is that the Whitsons' testimony that they changed the vehicle's oil in July makes it unlikely that Dixie "did anything to cause the warranty to be void." However, Dixie presented no evidence that would suggest that Whitsons' July oil change had any effect on the condition of the vehicle if it had been severely neglected prior to the oil change.

{¶33} The evidence before the court as to the engine condition was based upon a physical examination by vehicle technicians hired by the Whitsons. The Malibu's engine was found to have been severely neglected and the technicians opined that the engine had not been serviced well before the Whitsons purchased it from Dixie. The court credited the Whitsons' claim that Burns admitted the vehicle had not been serviced and obviously discredited his generic trial testimony that the vehicle would have been serviced in the ordinary course.

{¶34} Burns corroborated the Whitsons' claims through his statement on the video that he had fired a service manager. He additionally told the court that he had fired the service manager because he "wasn't doing the job I needed him to do." The Whitsons observed that the vehicle had not yet been marked for sale and had the need for several minor repairs, thus implying it may have been a new vehicle on the lot. Thus, competent and credible evidence supports the conclusion that Dixie sold the vehicle without knowing

its condition because it had not serviced the vehicle.

### Mileage

{¶35} Dixie states that the mileage between the sale date and the date the vehicle was examined at Jake Sweeney Chevrolet was 8,074 miles. Dixie further states that "no reasonable mind would believe any engine could be driven 20,000 miles without an oil change or service." Dixie does not articulate what argument it is making here but assumedly Dixie is implying that the "severe neglect" occurred to the vehicle while it was in the Whitsons' care. However, there was no evidence before the court that would indicate the Whitsons caused the neglect.[3] As described previously, the only evidence before the court was that the car had been severely neglected before it was sold to the Whitsons.

### Identity of the warranty company

{¶36} Dixie next argues that the Whitsons, at trial, referred to the warranty company as "Superior" when certain purchase documents stated that Superior was "First Automotive Service Corporation." Dixie does not articulate how the court erred with respect to this issue, or how it is relevant to the court's conclusion that Dixie breached the agreement. This court assumes that Dixie is pointing out an inconsistency in the Whitsons' testimony. However, Dixie's witness, Earl Burns, explained at trial that "Superior" referred to the type of warranty sold by First Automotive Service Corporation.

### The Whitsons' contact with Superior

{¶37} Dixie contends that the court erred when it found that the Whitsons never had any contact with Superior. Again, this finding is irrelevant to the court's conclusion that Dixie

---

3. The trial was continued to a second day to allow for the presentation of the video of the confrontation, which Della was unprepared to present to the court on the first day of trial. At the second hearing, Dixie brought a witness who would purportedly testify generally as to known issues with the Chevrolet engine. The magistrate disallowed the presentation of any additional evidence other than the video. Dixie then proffered a letter written by the witness. The letter indicated that this type of engine should have had an oil change every 4,000 miles and that driving 8,000 miles without an oil change could have resulted in oil sludge. Dixie did not assign error to the exclusion of this evidence.

breached the agreement. Regardless, the trial court specifically found that the Whitsons never had any "successful" contact with Superior. The court was referring to the Whitsons' attempts to obtain warranty coverage for the engine issue.

### Whether Dixie voided the warranty

{¶38} Dixie argues that the court erred when it stated that an issue in the case was whether Dixie voided the warranty. However, as discussed previously, there was evidence in the record to suggest that the warranty claim was denied because the vehicle had been sold without being serviced by Dixie. This court concludes that competent and credible evidence supports the small claims court's conclusion that Dixie breached the purchase agreement and therefore overrules Dixie's first, third, and fourth assignments of error.

{¶39} Assignment of Error No. 2:

{¶40} THE COURT AND MAGISTRATE ERRED WHEN THE MAGISTRATE WROTE "PLAINTIFF STATES SHE WAS HESITANT BUT MR. BURNS PROMISED REPAIRS AND OFFERED A SERVICE CONTRACT WARRANTY."

{¶41} Dixie challenges the court's conclusion that the Whitsons were hesitant to buy a vehicle and so in order to induce them to enter into the purchase agreement, Dixie represented that it would make repairs and would offer a warranty. Dixie argues that there was no evidence presented that the Whitsons were hesitant. This argument is meritless. Della testified that – at the end of hours on Dixie's lot and multiple test drives – "we hesitated." That Burns promised repairs was established by the "We Owe" document. That he offered a warranty was established by the purchase agreement. Regardless, whether the Whitsons were hesitant to purchase the vehicle or not is ultimately irrelevant to whether Dixie breached the agreement. This court overrules Dixie's second assignment of error.

{¶42} Assignment of Error No. 5:

{¶43} THE COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY NOT

REALIZING THE PLAINTIFFS' CLAIMS WERE AGAINST THE THIRD-PARTY WARRANTY COMPANY THEY CALLED "SUPERIOR INSURANCE" THEIR NAME FOR FIRST AUTOMOTIVE SERVICE CORPORATION OF NEW MEXICO.

{¶44} Dixie argues that the court erred in not finding that the Whitsons' breach of contract claim should have been brought against Superior. However, Dixie failed to object to the magistrate's decision on this basis and therefore this court's review is "extremely deferential" to the trial court. *Capano & Assocs., L.L.C. v. On Assignment, Inc.*, 12th Dist. Butler No. CA2015-08-153, 2016-Ohio-998, ¶ 13. Civ.R 53(D)(3)(b)(iv) provides:

> [e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53 (D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53 (D)(3)(b).

The Ohio Supreme Court has articulated the civil plain error standard as follows:

> Reviewing courts must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings.

*Goldfuss v. Davidson*, 79 Ohio St. 3d 116, 121, 1997-Ohio-401 (1997).

> Therefore, in order for a court to find plain error in a civil case, an appellant must establish (1) a deviation from a legal rule, (2) that the error was obvious, and (3) that the error affected the basic fairness, integrity, or public reputation of the judicial process and therefore challenged the legitimacy of the underlying judicial process.

*State v. Morgan*, 153 Ohio St. 3d 196, 2017-Ohio-7565, ¶ 40, citing *Goldfuss.*

{¶45} This court does not find that the record establishes an obvious legal error affecting the fairness of the proceedings. As described above, the court had competent and credible evidence before it that Dixie breached its agreement with the Whitsons.

Superior was never a party to the proceedings and there was limited evidence presented to the court concerning Superior. Dixie presumably had familiarity with Superior and its reasons for declining coverage but never sought to join the company. Months lapsed between the first hearing, the second hearing, and the written decision in this case. Thus, Dixie had ample opportunity to bring Superior into the action. This court overrules Dixie's fifth assignment of error.

{¶46} Judgment affirmed.

HENDRICKSON, P.J., and S. POWELL, J., concur.