[Cite as *Bainbridge Twp. Zoning Inspector v. Chagrin Valley Learning Collective Co-Op*, 2025-Ohio-146.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

BAINBRIDGE TOWNSHIP ZONING
INSPECTOR, et al.,

              Plaintiffs-Appellants,

    - vs -

CHAGRIN VALLEY LEARNING
COLLECTIVE CO-OP
d.b.a. CHAGRIN VALLEY
LEARNING COLLECTIVE, et al.,

              Defendants-Appellees.

CASE NOS. 2024-G-0021
           2024-G-0022


Civil Appeals from the
Court of Common Pleas


Trial Court Nos. 2019 M 000939
            2022 M 000612

---

## O P I N I O N

Decided: January 21, 2025
Judgment: Affirmed in part, reversed in part; remanded

---

*James R. Flaiz*, Geauga County Prosecutor, and *Linda M. Applebaum*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024 (For Plaintiffs-Appellants).

*Addison Caruso*, Fair Shake Environmental Legal Services, 2000 Auburn Drive, Suite 200, Beachwood, OH 44122 (For Defendants-Appellees).

*Jennifer L. Huber*, *Peter N. Griggs*, and *Julia E. Donnan*, Brosius, Johnson & Griggs, LLC, 6797 North High Street, Suite 350, Worthington, OH 43085 (For Amicus, Ohio Township Association and Coalition of Large Ohio Urban Townships).


MARY JANE TRAPP, J.

{¶1} In this consolidated appeal, plaintiffs-appellants, Bainbridge Township Zoning Inspector and William Lovell (collectively "Bainbridge"), appeal the judgment of the Geauga County Court of Common Pleas, following a bench trial, in which the court (1) granted Bainbridge's June 20, 2022 motion to show cause with respect to defendants-

appellees, Kelly's Working Well Farm, Inc., William A. Rowe, Kelly A. Clark, and Chagrin Valley Learning Collective Co-Op d.b.a. Chagrin Valley Learning Collective (collectively, "the defendants"); (2) denied Bainbridge's October 3, 2022 amended motion to show cause; (3) denied Bainbridge's complaint for permanent injunctive relief; and (4) granted the defendants' motion to enforce the consent order.

{¶2} Bainbridge raises four assignments of error on appeal, contending that the trial court erred (1) by failing to find the defendants in civil contempt for using the property for summer camps and an education program, in violation of the consent order; (2) by denying its complaint for permanent injunctive relief; (3) by granting the defendants' motion to enforce the consent order; and (4) in its imposition of contempt sanctions for the defendants' two stipulated violations of the consent order.

{¶3} After a careful review of the record and pertinent law, we find that the trial court erred by finding that the defendants' use of the property for the educational program at issue constituted "agritourism" under the parties' consent order. The trial evidence demonstrates that the program did not allow or invite "members of the general public" to participate in or enjoy that activity; rather, the program was expressly restricted to a particular class of people. Crucially, the trial evidence demonstrates that two of the defendants were closely affiliated with the organization that administered the program. Thus, rather than merely hosting an educational program, the defendants participated in the operation of a private organization on their property.

{¶4} Accordingly, we reverse, in part, the trial court's rulings on Bainbridge's October 3, 2022 amended motion to show cause, on Bainbridge's complaint for permanent injunctive relief, and on the defendants' motion to enforce the consent order.

2

We affirm the trial court's judgment in all other respects. We remand this matter to the trial court for further proceedings consistent with this opinion.

## Substantive and Procedural History

{¶5} The plaintiffs-appellants in this appeal are (1) the Bainbridge Township Zoning Inspector, who at all relevant times was Karen Endres ("Ms. Endres"), and (2) William Lovell ("Mr. Lovell"), who is the Bainbridge Township Fire Safety Inspector.

{¶6} The defendants-appellees are (1) Kelly's Working Well Farm, Inc. ("KWWF"), an Ohio nonprofit corporation; (2) William A. Rowe ("Mr. Rowe"); (3) Kelly A. Clark ("Ms. Clark"); and (4) Chagrin Valley Learning Collective Co-Op d.b.a. Chagrin Valley Learning Collective (the "CVLC"), an Ohio nonprofit corporation.

{¶7} In July 2012, Mr. Rowe and Ms. Clark purchased a 6-acre parcel of property on South Franklin Street in Bainbridge Township (the "property"). The property is zoned R-3A Rural Residential. In December 2012, Mr. Rowe and Ms. Clark incorporated KWWF with a stated purpose to "create a small scale, diversified education farm based on permaculture principles that would serve as a model of sustainable, community-based agriculture, while teaching about and providing food and other products to the community." The property contains several structures, which are referred to as "the Yurt, Pavilion, Tree Barn, Red Cottage, Library, and Farm Store." In 2018, Ms. Rowe and KWWF began operating a non-certified private school known as "Chagrin Valley School" (the "CVS") on the property. The CVS offered what it referred to as a "full-time, self-directed educational farm-immersion program" to home-schooled children from ages 5 to 18.

3

## *Initial Litigation*

{¶8} In September 2019, Mr. Lovell became aware of possible fire safety concerns at the property. Mr. Lovell obtained an administrative search warrant and searched the property along with representatives from various township, county, and state offices. In November 2019, Mr. Lovell issued a fire citation and "serious hazard order" to Mr. Rowe, Ms. Clark, and KWWF for several alleged violations of the Ohio Fire Code. Meanwhile, in October 2019, Ms. Endres revoked an agricultural use exemption for one of the structures on the property and issued a notice of violation to KWWF for failing to obtain a conditional use certificate to operate the CVS. Bainbridge filed a complaint for permanent and preliminary injunctive relief in the trial court to enjoin the alleged fire code and zoning violations (case no. 2019 M 000939).

{¶9} Mr. Rowe, Ms. Clark, and KWWF appealed the fire citation to the Bainbridge Township Board of Building Appeals (the "BBA"). The BBA held a hearing and upheld the citation. Mr. Rowe, Ms. Clark, and KWWF filed an administrative appeal to the trial court (case no. 2020 A 000146).

{¶10} KWWF appealed the zoning revocation and violation to the Bainbridge Township Board of Zoning Appeals (the "BZA"). The BZA held hearings. KWWF argued that it was not operating a school but was conducting agriculture and/or agritourism. The BZA found that the CVS was not agritourism and that a use variance (rather than a conditional use certificate) was necessary. KWWF filed an administrative appeal to the trial court (case nos. 2020 A 000497 and 2020 A 000597).

{¶11} The trial court consolidated the cases. In lieu of a preliminary injunction hearing, the parties entered into an agreed judgment entry that limited public access to

4

the property until full compliance with the fire citation or full resolution of the parties' disputes.

{¶12} On November 30, 2021, Mr. Lovell reinspected the property and issued a report detailing existing violations and necessary corrective actions. As of January 27, 2022, the serious fire hazards regarding the electrical issues on the grounds of the property had been abated. However, the serious fire hazards concerning the structures remained unabated.

{¶13} In December 2021, Mr. Rowe, Ms. Clark, and KWWF voluntarily dismissed their administrative appeals of the BBA and BZA decisions.

### Consent Order

{¶14} On April 27, 2022, the trial court filed a consent order and judgment entry (the "consent order"), that the parties had negotiated and executed to resolve their disputes. Four provisions are most relevant to this appeal.

{¶15} First, the parties agreed that "[t]he obligations of this Consent Order shall apply to and be binding upon Plaintiffs and Defendants [Mr. Rowe, Ms. Clark, and KWWF], their agents, officers, employees, contractors, assigns, successor's [sic] in interest, any person acting in concert, privity, or participation with them and any subsequent purchaser of the Subject Property." Section III, Paragraph 3.

{¶16} Second, the parties agreed that "[a]gritourism uses are permitted only on the grounds of the property under strict compliance with" several conditions, including (1) "the structures must be locked and secured from public access"; (2) "conspicuous signs, at least 8" x 11" in size, indicating no trespass or restricted access shall be placed on the door of every entrance of each structure"; (3) "no agritourism activity shall be held within

5

10 feet of any of the structures"; and (4) "notice of any major agritourism activity, where expected public participation exceeds 10 people per activity/event, must be provided to the Fire Safety Inspector within 5 days of the scheduled activity/event and may be provided via electronic mail."  Section V, paragraph 16.C.  The consent order expressly defined certain terms, including "agriculture" and "agritourism."  Section I, paragraphs 8 and 9.

{¶17}  Third, the parties agreed that the consent order shall not (1) "be construed to limit the authority of [Bainbridge] to seek relief for violations not alleged in the Complaint or Charges in Contempt of this Order"; (2) "bar the State of Ohio, Bainbridge Township or the Bainbridge Township Fire Inspector, State Fire Marshal, or the Zoning Inspector from bringing any action against the Defendants for any violations that occur after entry of this Order"; or (3) "be construed to relieve Defendants of their obligations to comply with all applicable federal, state, local statutes, regulations, or ordinances or any order entered in any court or board."  Section IV, paragraph 8.

{¶18}  Fourth, the parties agreed that "[u]pon approval and entry of this Consent Order by the Court, this Consent Order shall constitute the final judgment in the above-captioned matter between the Plaintiffs and the Defendants.  All prior orders and/or agreements in the above-captioned matter are withdrawn and rescinded by entry of this final judgment."  Section XIII, paragraph 29.

### Post-Judgment Litigation

{¶19}  After the consent order was filed, Ms. Clark notified Mr. Lovell about several purported "agritourism" activities on the property.  Two particular activities are relevant to this appeal.

6

Case Nos. 2024-G-0021, 2024-G-0022

**{¶20}** The first activity involved summer camps. On June 8, 2022, Ms. Clark emailed Mr. Lovell, writing, "Next week we begin farm summer camp, M-F, 9-3. The weeks of June 13, 20, 27, July 11, 18, 25, and August 1." (Trial Ex. 2). Ms. Clark operated the summer camps along with the camp's director, Erin Rodriguez ("Ms. Rodriguez"). KWWF advertised the summer camps on its website and Facebook page. Ms. Rodriguez later testified that most of the activity involved "gardens," "foraging," "harvesting," "plan[t]s and fruits," "vegetables," "processing," and the farm animals.

**{¶21}** The second activity involved educational programs conducted by the CVLC (hereinafter, "the CVLC program"). On August 30, 2022, Ms. Clark emailed Mr. Lovell, writing, "We will be holding agri-cultural educational events at the farm throughout the month of September Tues - Fri from 8:30 - 4:00. You can call them 'educational programming.'" (Trial Ex. 10). The CVLC was incorporated in 2021 and began using the property as its principal place of business in September 2022. The CVLC provides what it refers to as "self-directed education" to children from ages 5 to 18. It operates four days a week (Tuesdays through Thursdays) from 8:30 a.m. to 4:00 p.m. The children attending the CVLC are required to be registered home schoolers. In addition, children and parent members of the CVLC must complete a trial period before acceptance into the CVLC program. Participation in the CVLC program is subject to the CVLC's enrollment process and procedures and the payment of its fees. Ms. Clark later testified that she is not a part of the CVLC or a staff member, and she does not collect revenue from the organization. However, information about the CVLC and its program appeared on KWWF's website. In these materials, Ms. Clark was identified as the CVLC's "founder." (Trial Ex. 17).

7

Case Nos. 2024-G-0021, 2024-G-0022

**{¶22}** On June 10, 2022, KWWF, Mr. Rowe, and Ms. Clark filed a motion to enforce the consent order. They alleged that Bainbridge had engaged in harassing and bad faith conduct in the form of threatening letters from Ms. Endres and the county prosecutor's office.

**{¶23}** On July 20, 2022, Bainbridge filed a motion to show cause. Bainbridge requested that the trial court find KWWF, Ms. Clark, and Mr. Rowe in contempt for hosting the summer camps on the property in violation of the consent order.

**{¶24}** On October 3, 2022, Bainbridge filed an amended motion to show cause. Bainbridge requested that the trial court find KWWF, Ms. Clark, and Mr. Rowe in contempt for hosting the CVLC program on the property in violation of the consent order.

**{¶25}** On October 20, 2022, Bainbridge filed a new complaint against all of the defendants for permanent injunctive relief (case no. 2022 M 000612). Bainbridge alleged that the defendants violated the consent order, the BZA decision, and the township zoning resolution by "hosting, operating, and/or managing" the CVLC on the property.

**{¶26}** On three occasions in October and November 2022, Mr. Lovell and a zoning employee filmed the children's activities on the property from a nearby location.

**{¶27}** The trial court consolidated the cases and set the matter for a bench trial. Prior to trial, the parties filed stipulations of fact. Several stipulations involved facts relating to the CVLC, its program, and the summer camps. The defendants also stipulated that there were two violations of the consent order. Specifically, paragraph 24 states, "On November 29, 2022, a CLVC [sic] staff member used a propane stove to boil water located underneath the awning of a structure known as the Pavilion. The Farm concedes that this activity violates the consent order." Paragraph 25 states, "On

8

November 29, 2022, children participating in CVLC programming sat and played on hay bales underneath an overhang of a structure known as the Pavilion. The Farm concedes that this activity violates the consent order."

***Bench Trial and Judgment***

**{¶28}** On February 7, 2023, the trial court held a bench trial. Bainbridge presented testimony from Mr. Lovell, Ms. Endres, and Paige Rutz, who was a CVLC staff member. Bainbridge also submitted numerous exhibits. The defendants presented testimony from Eszter Bock, whose children attended the CVLC program, Ms. Clark, and Ms. Rodriguez.

**{¶29}** On August 23, 2023, the trial court filed a judgment entry, in which it (1) denied Bainbridge's July 2022 motion to show cause, (2) granted Bainbridge's October 2022 amended motion to show cause, (3) granted the defendants' motion to enforce the consent order, and (4) denied Bainbridge's complaint for permanent injunctive relief. Three of the trial court's findings are most relevant to this appeal.

**{¶30}** First, Bainbridge had argued that the BZA and BBA decisions controlled on the issue of whether the summer camps and the CVLC program constituted "agritourism." The trial court found that res judicata did not apply because there had been changes in material facts and because Ohio's public policy favored agritourism. In addition, the trial court found that the consent order rescinded all prior orders, including the BZA and BBA decisions.

**{¶31}** Second, the trial court found that Bainbridge failed to establish that the defendants' activities were not "agriculture or agritourism." The court found that "the Farm" is "open to the public"; it is not a school or a daycare; and the summer camps and the CVLC program were "agritourism" under R.C. 901.80(A).

9

{¶32} Third, the trial court found "the Farm" in indirect civil contempt for the two stipulated violations of the consent order. As a sanction, the court fined "the Farm" $500 ($250 for each stipulated violation). The court gave "the Farm" an opportunity to purge its contempt "by placing and maintaining a 12-point bold type, the following Notice on its website:

{¶33} "**Fire Code violations may exist on this Property. No agritourism activity shall be held within ten feet of any of the structures including the yurt, pavilion, tree barn, red cottage, library, and farm store**. *See* CJE page 7.

{¶34} "The Notice must remain on the Farm's website until all violations found by Mr. Lovell on November 30, 2022 [sic], are corrected." (Emphasis in original.)

{¶35} Bainbridge appealed[1] and raises the following four assignments of error:

{¶36} "[1.] By relying on erroneous conclusions of law, including a determination that the BZA order was rescinded and withdrawn, failing to conclude that the BZA's order against the defendants precludes school and camp uses, and misinterpreting agritourism under the agreement, the trial court's decision to not hold defendants in contempt for using their property for a school and camp was arbitrary, unreasonable, and not in comport with the record.

{¶37} "[2.] Because the trial court failed to offer any meaningful opportunity for defendants to purge their contempt, the purge condition order was arbitrary, unreasonable, and not in comport with the law.

---

1. This court dismissed Bainbridge's first consolidated appeal (case nos. 2023-G-0033, 2023-G-0034, and 2023-G-0035) for lack of a final appealable order because the record indicated that the complaint in one of the underlying cases (case no. 2022 M 000507) had not been resolved and that there was no Civ.R. 54(B) certification. *See Bainbridge Twp. Zoning Inspector v. Chagrin Valley Learning Collective Co-Op*, 2024-Ohio-1008 (11th Dist.). The plaintiff in that case subsequently dismissed its claims without prejudice.

Case Nos. 2024-G-0021, 2024-G-0022

{¶38} "[3.] Because CVLC operations at the site are prohibited property uses, not permitted agritourism activities, the trial court erred in denying the Bainbridge Township Zoning Inspector's complaint for a permanent injunctive relief against the defendants for new violations.

{¶39} "[4.] The trial court erred in granting defendant's motion to enforce settlement agreement because notices to the defendants were sent in accordance with the agreement, and defendants' uses do not amount to agritourism."

**Standard of Review**

{¶40} Bainbridge's first, third, and fourth assignments of error involve the trial court's findings following a bench trial. "[O]n appeal from a bench trial we review the trial court's factual findings under the manifest weight standard of review * * *." *Ultimate Salon & Spa, Inc. v. Legends Constr. Group*, 2019-Ohio-2506, ¶ 30 (11th Dist.). "'The [appellate] court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶41} "[T]he trial court's legal findings," by contrast, "are reviewed de novo." *Ultimate Salon* at ¶ 30. De novo review generally means the appellate court

11

independently reviews the record and affords no deference to the trial court's decision. *In re Placement of A.R.V.*, 2016-Ohio-4929, ¶ 12 (11th Dist.).

## Civil Contempt

{¶42} In its first assignment of error, Bainbridge contends that the trial court erred by failing to find the defendants in civil contempt for using the property for the summer camps and the CVLC program, in violation of the consent order.

{¶43} "Contempt is defined in general terms as disobedience of a court order." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554 (2001). Contempt is either indirect or direct, with indirect contempt generally referring to contempt that occurs outside of court proceedings. *MWL Enterprises LLC v. Mid-Miami Invest. Co.*, 2023-Ohio-547, ¶ 36 (2d Dist.). "Civil contempt sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. Thus, civil contempts are characterized as violations against the party for whose benefit the order was made." (Citation omitted.) *Russo* at 555. A finding of civil contempt requires clear and convincing evidence that the party has failed to comply with the court's prior order. *Allen v. Allen*, 2022-Ohio-3198, ¶ 61 (11th Dist.)

{¶44} "In a consent decree, the litigants stipulate to the termination of a lawsuit by assenting to specified terms, which the court agrees to enforce as its judgment by journalizing an entry reflecting the terms of the settlement agreement." *Infinite Sec. Solutions, L.L.C. v. Karam Properties II, Ltd.*, 2015-Ohio-1101, ¶ 27. "When the court incorporates the terms of the parties' settlement agreement into a consent decree, the court can enforce those terms as its judgment." *Id. See also State v. Mann*, 2007-Ohio-

12

6937, ¶ 24 (11th Dist.) (a consent order is a contract and is based on the agreement of the parties).

{¶45} Contract principles are applicable to an analysis of consent decrees. *SGN Internatl. Oil Co. v. Ohio Liquor Control Comm.*, 2008-Ohio-6816, ¶ 20 (10th Dist.). "When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37.

{¶46} "'As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.'" *Id.*, quoting *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 11. "[T]erms in a contract are ambiguous when they are susceptible to more than one reasonable interpretation." *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 12. "It is generally the role of the fact-finder to resolve any ambiguity in a contract." *Id.* "In other words, whether a contract is ambiguous is a question of law, but the resolution of an ambiguous term in a contract is a question of fact." *Id.*

### *Rescission*

{¶47} Bainbridge first argues that the trial court erroneously found that the consent order rescinded the BZA and BBA decisions.

{¶48} Section XII, paragraph 29 of the consent order provides, "Upon approval and entry of this Consent Order by the Court, this Consent Order shall constitute the final

13

judgment in the above-captained matter between the Plaintiffs and the Defendants. *All prior order*s and/or agreements *in the above-captioned matter are withdrawn and rescinded by entry of this final judgment.*" (Emphasis added.) The trial court found that this provision rescinded the BZA and BBA decisions because "all" means "every" or "any whatever."

{¶49} While we do not dispute this definition, it was not dispositive. The trial court overlooked the requirement in the provision that "all prior orders" be "in the above-captioned matter." For example, as stated, the parties previously entered into an agreed judgment entry in lieu of a preliminary injunction hearing. The provision withdrew and rescinded that order. By contrast, the BZA and BBA decisions were not issued in any of the trial court's consolidated cases. Rather, the defendants *appealed* the BZA and BBA decisions to the trial court, and those appeals were assigned a case number. The defendants later dismissed their administrative appeals before the parties entered into the consent order.

{¶50} The BZA and BBA decisions were also preserved pursuant to Section IV, paragraph 8 of the consent order. That provision provides, in relevant part, "Nothing in this Consent Order shall be construed to relieve Defendants of their obligations to comply with all applicable federal, state, local statutes, regulations, or ordinances or *any order entered in any* court or *board.*" (Emphasis added.) The BZA and BBA decisions constitute "order[s] entered in any . . . board."

{¶51} Accordingly, the trial court erred by finding that the consent order rescinded the BZA and BBA decisions.

14

### Res Judicata

**{¶52}** Bainbridge next argues that the trial court should have found that the defendants were estopped from arguing that the summer camps and the CVLC program were "agritourism." According to Bainbridge, the BZA decision resolved that issue in its favor and against the defendants.

**{¶53}** In Ohio, the doctrine of res judicata encompasses the concepts of claim preclusion, which is known as res judicata or estoppel by judgment, and issue preclusion, which is known as collateral estoppel. *State ex rel. Schachter v. Ohio Pub. Emps. Retirement Bd.*, 2009-Ohio-1704, ¶ 27. Claim preclusion prevents subsequent actions by the same parties or their privies based upon any claim arising out of a transaction that was the subject matter of a previous action. *Id.* The previous action is conclusive for all claims that were or that could have been litigated in the first action. *Id.* Issue preclusion, or collateral estoppel, precludes the relitigation in a second action of an issue that had been actually and necessarily litigated and determined in a prior action that was based on a different cause of action. *Id.* at ¶ 28. Res judicata, whether claim or issue preclusion, applies to quasi-judicial administrative proceedings. *Id.* at ¶ 29. An administrative proceeding is quasi-judicial for purposes of res judicata if the parties have had an ample opportunity to litigate the issues involved in the proceeding. *Id.* "Where, however, there has been a change in the facts in a given action which either raises a new material issue, or which would have been relevant to the resolution of a material issue involved in the earlier action, neither the doctrine of [r]es judicata nor the doctrine of collateral estoppel will bar litigation of that issue in the later action." *State ex rel. Westchester Estates, Inc. v. Bacon*, 61 Ohio St.2d 42, 45 (1980).

15

{¶54} The trial court found that res judicata did not apply because the defendants had shown changes in several material facts, including the following: (1) "The Farm now meets the statutory income requirements to be classified as a farm"; (2) "The Farm is taxed at the CAUV rate"; (3) "The Farm receives no income from hosting the CVLC"; (4) "Home schoolers and campers on the Farm are members of the general public sharing the Farm with other members of the general public"; and (5) "The Farm provides home schoolers, campers, and others with education, recreation and entertainment through farm chores, gardening, caring for animals, and other agricultural activities." Bainbridge argues that none of these factors are relevant. We disagree.

{¶55} At the time of the BZA decision, the property did not meet the income requirement to qualify as a "farm" under R.C. 901.80(A)(4) ("'Farm' means land that is composed of tracts, lots, or parcels . . . totaling less than ten acres devoted to agricultural production if the land produces an average yearly gross income of at least twenty-five hundred dollars from agricultural production"). For that reason alone, the defendants' activities could not have constituted "agritourism" under R.C. 901.80(A)(2), which requires, among other things, that the relevant activity be "conducted on a farm." In addition, subsequent to the BZA decision, the parties entered into the consent order, which restricted the defendants' activities to "[a]gritourism uses . . . only on the grounds of the property under strict compliance with" certain conditions. Section V, paragraph 16.C. The defendants subsequently held various activities on the grounds, including the summer camps and the CVLC program. The issue before the trial court was whether those activities were permitted under the terms of the parties' consent order, including its

16

definition of "agritourism."  While the trial evidence indicates that those activities were similar to the defendants' prior activities, they were not identical.

{¶56}  Accordingly, the trial court properly found that res judicata did not apply.  At most, the BZA decision constituted persuasive authority on the meaning of "agritourism."

*Agritourism*

{¶57}  Bainbridge next argues that the trial court incorrectly found that the summer camps and the CVLC program qualify as "agritourism" under the consent order.

{¶58}  The consent order defines "agritourism" as follows:

{¶59}  "'Agritourism' means [1] an agriculturally related educational, entertainment, historical, cultural, or recreational activity, including you-pick operations or farm markets, [2] conducted on a farm [3] that allows or invites members of the general public to observe, participate in, or enjoy that activity.  [4] For purposes of this definition, a 'farm' means land that is composed of 10 acres devoted to agricultural production or totaling less than ten (10) acres devoted to agricultural production if the land produces an average year gross income of at least twenty-five hundred dollars from agricultural production." Section I, paragraph 9.

{¶60}  The consent order's definition of "agritourism" is the same as the definition in R.C. 901.80(A)(2).  As one court has explained, "In 2016, Senate Bill 75 went into effect with the goal of encouraging the growth of agritourism in Ohio.  The changes made by the bill included limiting the authority of a board of zoning appeals (among others) to prohibit agritourism through zoning, applying current agricultural-use valuation to land used for agritourism for property tax purposes, and establishing civil-law immunity for

17

Case Nos. 2024-G-0021, 2024-G-0022

agritourism providers." *Lusardi v. Caesarscreek Twp. Bd. of Zoning Appeals*, 2020-Ohio-4401, ¶ 3 (2d Dist.).[2]

**{¶61}** The consent order's foregoing definition of "farm" is nearly identical to the definition in R.C. 901.80(A)(4). The consent order also uses R.C. 519.01's definition of "agriculture," providing as follows:

**{¶62}** "'Agriculture,' as defined in R.C. 519.01, means farming; ranching; algaculture meaning the farming of algae; aquaculture; apiculture; horticulture; viticulture; animal husbandry, including, but not limited to, the care and raising of livestock, equine, and fur-bearing animals; poultry husbandry and the production of poultry and poultry products; dairy production; the production of field crops, tobacco, fruits, vegetables, nursery stock, ornamental shrubs, ornamental trees, flowers, sod, or mushrooms; timber; pasturage; any combination of the foregoing; and the processing, drying, storage, and marketing of agricultural products when those activities are conducted in conjunction with, but are secondary to, such husbandry or production." Section I, paragraph 8.

**{¶63}** Ohio appellate courts have had limited occasion to apply the statutory definition of "agritourism." For instance, in *Lusardi*, 2020-Ohio-4401 (2d Dist.), the appellate court held that the trial court did not abuse its discretion by affirming a board of zoning appeals' decision finding that celebratory events such as agriculturally-themed weddings and receptions did not constitute "agritourism." *See id.* at ¶ 19-21. The court reasoned that the event "had far more to do with the agricultural setting than with the

---

2. R.C. 519.21(C)(4) provides, in relevant part, that "[sections 519.02 to 519.25 of the Revised Code] confer no power on any township zoning commission, board of township trustees, or board of zoning appeals to prohibit in a district zoned for agricultural, industrial, residential, or commercial uses, the use of any land for . . . [a]gritourism." The term "agritourism" has the same meaning as in R.C. 901.80. *See* R.C. 519.21(D)(2).

18

Case Nos. 2024-G-0021, 2024-G-0022

agricultural activity on the property." *Id.* at ¶ 19. In *Miami Twp. Bd. of Trustees*, 2022-Ohio-3459 (2d Dist.), the appellate court affirmed the trial court's finding on summary judgment that a landowner's use of his barn for weddings and other celebratory events did not constitute "agritourism." *Id.* at ¶ 24. The court reasoned that there was no evidence that "this use of the barn is incident to any agricultural use of the property. Instead, the barn was built in order to serve as an event venue in a rural, agricultural setting." *Id.* at ¶ 23.

**{¶64}** Bainbridge does not appear to dispute that the summer camps and the CVLC program were (1) "agriculturally related" and "educational" and (2) "conducted on a farm." In fact, Bainbridge argues that the CVLC is a "school." Rather, Bainbridge argues that the summer camps and the CVLC program (1) were not an "activity" and (2) did not "allow[] or invite[] members of the general public to observe, participate in, or enjoy that activity." Consent Order at section I, paragraph 9. We review both arguments in turn.

## Activity

**{¶65}** As Bainbridge accurately notes, the consent order's definition of "agritourism" uses the term "activity" rather than "property use." Bainbridge contends that this is a meaningful distinction. According to Bainbridge, "agritourism" involves "a casual or recreational type of situation," while the summer camps and the CVLC program are "property uses" subject to township zoning. In support of its argument, Bainbridge quotes the dictionary definition of "activity," i.e., "a form of organized, supervised, often extracurricular recreation" or "something that is done for enjoyment, especially an organized event." Bainbridge does not define the term "property use," much less explain

19

how it differs from an "activity." In fact, the consent order expressly utilizes the phrase "agritourism *use*s." (Emphasis added.) Section V, paragraph 16.C. In addition, the consent order's definition of "agritourism" is not limited to "recreation." As stated, it expressly encompasses "activity" that is "educational," "entertainment," "historical," or "cultural." Section I, paragraph 9.

{¶66} Bainbridge also argues that "agritourism activities" are held "on a discreet basis" and "are not part of [a] continuous program spanning an extended period of time." In support of its argument, Bainbridge cites the BZA's similar finding in the BZA decision. The BZA cited no legal authority in support of its finding. In addition, the consent order's definition of "agritourism" does not support Bainbridge's construction. As stated, the definition includes "you-pick operations" and "farm markets" as examples of "agritourism." Section I, paragraph 9. Neither activity is necessarily limited in duration.

### Members of the General Public

{¶67} Bainbridge next argues that the summer camps and the CVLC program did not "allow[] or invite[] members of the general public to observe, participate in, or enjoy that activity." Consent Order at section I, paragraph 9. Bainbridge contends that the camps and program were "restricted to children of a certain age[], who have been vetted and accepted into the school program."

{¶68} The consent order does not define the phrase "members of the general public"; therefore, we apply its ordinary meaning. *See Sutton Bank v. Progressive Polymers, L.L.C.*, 2020-Ohio-5101, ¶ 15. The ordinary meaning of "general public" is "all the people of an area, country, etc." *See Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/the%20general%20public. (accessed January 8, 2025). The

20

Case Nos. 2024-G-0021, 2024-G-0022

ordinary meaning of "member" is "one of the individuals composing a group." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/member. (accessed January 8, 2025). Therefore, "members of the general public" means individuals that compose the people of an area, country, etc.

{¶69} The trial evidence demonstrates that the summer camps allowed or invited "members of the general public" to participate in or enjoy that activity. The parties' Stipulations of Fact provide that "[t]he 2022 Summer Camp was run and operated by Kelly's Working Well Farm at 16519 S. Franklin St., Chagrin Falls" and "was offered for ages 5 through 12 during the summer months." *Id.* at ¶ 22, 23. This is confirmed by the advertisement that KWWF posted on its "More Than A Farm" website:



(Trial Exhibit 5).

21

Case Nos. 2024-G-0021, 2024-G-0022

**{¶70}** While participation was expressly limited to children ages 5 through 12, such persons constitute "members of the general public." The consent order does not use the phrase "the general public" or "*all* members of the general public," both of which would arguably encompass children and adults. The Supreme Court of Ohio has explained in the context of statutory construction that "[w]here the language of a statute is clear and unambiguous, it is the duty of the court to enforce the statute as written, making neither additions to the statute nor subtractions therefrom." *Hubbard v. Canton City School Bd. of Edn.*, 2002-Ohio-6718, ¶ 14. There is also no evidence supporting Bainbridge's assertion that summer camp participants had to be "vetted" or "accepted" into the CVLC program.

**{¶71}** Unlike the summer camps, the trial evidence demonstrates that the CVLC program *did not* allow or invite "members of the general public" to participate in or enjoy that activity. Rather, the CVLC program was expressly restricted to a particular class of children. For instance, the parties' Stipulations of Fact provide that (1) "[t]he children attending the CVLC must be registered home schoolers"; (2) "Children and Parent members of the CVLC go through a trial period before acceptance into the CVLC program"; and (3) "[p]articipation in the CVLC is subject to the enrollment process and procedures." *Id.* at ¶ 12, 14, 18. There was no evidence indicating that anyone else was invited or permitted to observe, participate in, and/or enjoy the CVLC program. Although Ms. Rodriguez testified that groups from Hawken's Middle and Upper Schools visited at the same time, those groups engaged in "very similar" activities, not the CVLC program.

22

**{¶72}** Crucially, the trial evidence demonstrates Ms. Clark and KWWF were closely affiliated with the CVLC as an organization. For instance, the CVLC advertised the program on its Facebook page and included a link to its website:



(Trial Ex. 15).

**{¶73}** The foregoing demonstrates that the CVLC's website was part of KWWF's "More Than A Farm" website. Further, the CVLC's website identified Ms. Clark as its "founder":

23

Case Nos. 2024-G-0021, 2024-G-0022



## KELLY CLARK
## OUR FOUNDER

Kelly grew up spending her free time reading and exploring the woods with the neighborhood kids. She majored in physics at The University of Chicago (BA) and The University of California at Santa Cruz (MA). Kelly taught in several mostly progressive/mainstream educational environments from kindergarten through college undergraduate level. During that time she developed a variety of curriculum in science (physics, chemistry, physical science), math (algebra & statistics), food systems, and engineering/design and was constantly experimenting with approaches to increase students engagement with the material (coaching, team work, inquiry based learning, problem based learning, experiential learning, and so on). After over a quarter of a century she had to acknowledge that she had failed to discover an approach that would result in authentic, deep, and lasting learning for even a fraction of the students. Rather she found that most students (at the high school level) were primarily focused on the evaluation aspect rather than meaningful engagement with the material. And on top of that they had very little free time and were highly stressed.

On the advice of a colleague, she looked into the democratic education model first practiced in the US by Sudbury Valley School (https://sudburyvalley.org/) in Massachusetts. Peter Gray's book, Free to Learn (https://www.barnesandnoble.com/w/free-to-learn-peter-gray/1114075996), about the fundamental role of free play in learning, inspired Kelly to leave her job at an elite private school to start Chagrin Valley Learning Collective on her permaculture farm.

(Trial Ex. 17).

{¶74} Thus, rather than merely hosting the CVLC program, the defendants participated in the operation of a private organization on their property.

{¶75} The trial court applied the definition of "agritourism" in R.C. 901.80(A)(2). While that definition is the same, the trial court should have applied the consent order in relation to Bainbridge's motions to show cause. The trial court also found that "the Farm is not a school" under R.C. 2925.01(Q) and that "there is no evidence the Farm operates a licensed child care program" under R.C. 5104.01. Even if such findings were correct, they do not inform the issue of whether the CVLC program qualifies as "agritourism" under the consent order. The trial court further found that "the Farm is open to the public," quoting Justice DeWine's concurring opinion in *Cleveland Botanical Garden v. Worthington Drewien*, 2022-Ohio-3706, that "open to the public means simply that it is to remain 'accessible to all' in the same way that anyone can visit a public museum or

24

library." *Id.* at ¶ 43. However, the consent order does not use the phrase "open to the public." In addition, the consent order's definition of "agritourism" focuses on the specific *activity* at issue, not the general use of the property.

{¶76} The defendants assert that "[m]any agricultural activities that the general public is invited to observe, participate [in], or enjoy involve distinct groups or advanced [sic] sign-ups, such as 4H programs, horseback riding classes, or goat yoga." The defendants cite no authority or evidence in support of this assertion. While we recognize that certain agritourism activities may only attract the interest of certain people, the relevant inquiry in this case is who was *allowed or invited* to observe, participate in, or enjoy the activity, not who actually did so.

{¶77} Accordingly, the evidence supports the trial court's finding that the summer camps constituted "agritourism" under the meaning of that term as used in the consent order. However, the evidence does not support the trial court's finding that the CVLC program qualified as such. We do not find, as a matter of law, that educational programs may never constitute "agritourism" under this or a similar definition. This is because, as one court has aptly explained, [w]hether a particular activity constitutes 'agritourism' is an issue that shades to gray quite quickly . . . [g]iven the great variety of factual situations." *Lusardi*, 2020-Ohio-4401, at ¶ 20 (2d Dist.). Instead, we find only that when the trial evidence is applied to the definition of "agritourism" in the consent order, the CVLC program did not qualify. Since the CVLC program did not constitute "agritourism" under the consent order, the trial court erred in failing to find the defendants in contempt.

{¶78} Bainbridge's first assignment of error has merit in part.

Case Nos. 2024-G-0021, 2024-G-0022

**Permanent Injunction**

{¶79} In its third assignment of error, Bainbridge contends that the trial court erred by denying its complaint for permanent injunctive relief.

{¶80} Bainbridge alleged in its complaint and sought to establish at trial that the defendants' actions violated (1) the township zoning resolution, (2) the BZA decision, and (3) the consent order. The trial court found that Bainbridge "failed to show by clear and convincing evidence [that] Defendants' uses violate Bainbridge's *zoning laws*." (Emphasis added.)

{¶81} With respect to the BZA decision, we have found above that the BZA decision was not controlling. Therefore, the trial court's failure to address the BZA decision was harmless error.

{¶82} With respect to the consent order, we have found above that the CVLC program did not constitute "agritourism" under the consent order. In addition, the consent order was binding on the named defendants at that time, which were Mr. Rowe, Ms. Clark and KWWF, as well as "any person acting in concert, privity or participation with them." Section III, paragraph 3. The CVLC does not dispute that the consent order applied to it. Therefore, the trial court erred by failing to address the consent order.

{¶83} With respect to the zoning resolution, the trial court purported to apply the definition of "agritourism" in R.C. 901.80(A)(2). However, it did not have the benefit of our construction of that term as similarly defined in the consent order.

{¶84} Accordingly, the trial court erred by denying Bainbridge's complaint in relation to the defendants' operation of the CVLC program on the property. Bainbridge's third assignment of error has merit in part.

26

**Motion to Enforce**

{¶85} In its fourth assignment of error, Bainbridge contends that the trial court erred by granting the defendants' motion to enforce the consent order.

{¶86} The trial court found that the summer camps and the CVLC program were "agritourism." For the reasons explained above, the trial court's finding was erroneous in relation to the CVLC program. Accordingly, the trial court erred by granting the defendants' motion in relation to the CVLC program.

{¶87} Bainbridge's fourth assignment of error has merit in part.

**Contempt Sanctions**

{¶88} Finally, in its second assignment of error, Bainbridge contends that the trial court erred in its imposition of contempt sanctions for the defendants' two stipulated violations of the consent order.

{¶89} Trial courts generally have broad discretion when imposing contempt sanctions. *State ex rel. Yost v. Anthony*, 2022-Ohio-3188, ¶ 31 (4th Dist.). Thus, reviewing courts will not reverse a trial court's decision regarding contempt sanctions unless the court abused its discretion. *Id.* An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004).

{¶90} As stated, the defendants stipulated that there were two violations of the consent order on November 29, 2022. The trial court ordered KWWF to pay a $500 fine consisting of $250 for each stipulated violation. The trial court stated that KWWF may purge its contempt by placing a specified notice on its website.

27

**{¶91}** Bainbridge first argues that the "purge conditions" are "woefully inadequate" because the order (1) is not directed to an identified person, (2) does not include the property owners; (3) implies that "the Farm" is responsible for violations, (4) fails to resolve the contempt because such signs are already required, and (5) states that fire hazards "may" exist instead of that "unabated fire hazards exist," contrary to the consent order and Mr. Lovell's testimony. According to Bainbridge, a reasonable order would have suspended all further agritourism events until the defendants abated all fire hazards within the structures.

**{¶92}** With respect to the first, second, and third issues, the trial court imposed sanctions against "the Farm," which it defined in its entry as "Kelly's Working Well Farm LLC" [sic].[3] This is consistent with paragraphs 24 and 25 of the parties' Stipulations of Fact, which provide that "*the Farm* concedes that this activity violates the consent order." (Emphasis added.)

**{¶93}** With respect to the fourth issue, Bainbridge is incorrect that the trial court imposed an existing requirement. The trial court ordered KWWF to post a notice on its website. The consent order does not contain this requirement. Rather, the consent order requires the defendants to place signs "indicating no trespass or restricted access . . . on the door of every entrance of each structure . . . during agritourism activities." Section V, paragraph 16.C.ii. Within our standard of review, we cannot say that the requirement of a rather ominous notice on its website, which visitors may read before making the decision to come to the property, as a purge condition is an abuse of discretion.

---

3. KWWF is a corporation that uses "Inc." rather than a limited liability company that uses "LLC."

28

Case Nos. 2024-G-0021, 2024-G-0022

{¶94} Finally, with respect to the fifth issue, the trial court did not abuse its discretion by stating that fire hazards "may" exist. The consent order provided that certain "serious and distinct fire hazards concerning the structures, or within, on, or affixed to the structures . . . remain unabated *at the time of the execution of this Consent Order*." (Emphasis added.) Section V, paragraph 15. In addition, Mr. Lovell testified that existing violations for the structures concerned "more Building Code than Fire Code, at this point." The trial court found that Mr. Lovell was not "competent to testify if the pavilion heating equipment complies with the various specifications." Thus, it appears the trial court found that Bainbridge had not definitively established the existence of current fire hazards. The choice between credible witnesses and their conflicting testimony rests solely with the trial court as the finder of fact, and we may not substitute our own judgment. *See State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶95} Bainbridge next argues that the trial court's order fails to provide the defendants a meaningful opportunity to purge their contempt. Bainbridge cites *Tucker v. Tucker*, 10 Ohio App.3d 251 (10th Dist. 1983), where the trial court found a party in contempt for failing to maintain his child support payments under a divorce decree. *Id.* at 251. The court imposed ten days in jail to be suspended on the condition that the party keeps his future payments current and timely. *Id.* The appellate court found that a "judgment entry suspending [the party's] punishment on condition that he comply with the [child] support order in the future" did not "properly allow[] for purging." *Id.* at 252. The court reasoned that "insofar as [the contempt order] purports to regulate future conduct, it simply amounts to the court's reaffirmation of its previous support order and can have

29

no effect since any effort to punish a future violation of the support order would require new notice, hearing, and determination." *Id.*

**{¶96}** Bainbridge's argument is unusual in that it is typically the party that was held in contempt, i.e., the contemnor, that challenges purge conditions on appeal. *See, e.g.*, *Tucker.* In any event, as explained above, Bainbridge is incorrect that the trial court imposed an existing requirement as a purge condition. Accordingly, Bainbridge has not established that the trial court abused its discretion in its imposition of sanctions for the two stipulated violations.

**{¶97}** Bainbridge's second assignment of error is without merit.

## Disposition

**{¶98}** In sum, the trial court erred by finding that the consent order rescinded the BZA and BBA decisions and that the CVLC program constituted "agritourism." Accordingly, we reverse, in part, the trial court's rulings on Bainbridge's amended motion to show cause, Bainbridge's complaint for permanent injunctive relief, and the defendants' motion to enforce the consent order. We affirm the trial court's judgment in all other respects. On remand, the trial court shall perform the following:

**{¶99}** (1) The trial court shall find that the consent order did not rescind the BZA and BBA decisions.

**{¶100}** (2) The trial court shall find that the CVLC program did not constitute "agritourism" under the consent order.

**{¶101}** (3) The trial court shall grant Bainbridge's October 3, 2022 amended motion to show cause; find KWWF, Ms. Clark, and Mr. Rowe in civil contempt for violating the

consent order by operating the CVLC program on the property; and impose appropriate sanctions and purge conditions for those violations.

{¶102} (4) The trial court shall grant, in part, Bainbridge's October 20, 2022 complaint for permanent injunctive relief; issue an appropriate permanent injunction that prohibits the defendants from violating the consent order by operating the CVLC program on the property; and determine whether the defendants' foregoing activity also violated the township zoning resolution.

{¶103} (5) The trial court shall deny, in part, the defendants' June 10, 2022 motion to enforce the consent order.

{¶104} For the foregoing reasons, the judgment of the Geauga County Court of Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings.

ROBERT J. PATTON, P.J.,

MATT LYNCH, J.,

concur.

31